Mr. Bridger and also Liberty Mutual, Mr. Watson, you have requested your uninterrupted time and then when it's over or earlier, the clock will let us know and then you'll be open for questions, alright? Alright, you're on. Thank you. May it please the Court, I'm Robert Jeffrey Bridger, here on behalf of the Appellant Specialty Rntl Tools and Supply, LLP, Oil States Energy Services and Zurich American Insurance Company. I'm joined by my partner, Mark Clark. As in the briefs throughout argument, I expect both I and other counsel will refer to the appellants collectively as STS, that was the abbreviation that was used throughout the record, and to appellees as Doiron or LDI. It would be difficult to find a case that presents a starker contrast between a non-maritime oil and gas well service contract and a completely separate maritime charter of a vessel than the two separate contracts Apache individually made with the parties to this case. Consequently, the erroneous judgments now before this Court on Bonk also graphically demonstrate how the development of the Davis factors from the case Davis and Sons v. Gulf Oil Corp. have become ineffective, if not misleading, in determining reasonably and consistently what contracts should be construed under maritime law and which ones are properly subject to state law. In short, cases in this Court preceding Davis and still viable haven't been overruled, perfectly sound authority, and as it turns out, now that we look at them somewhat in hindsight and through the lens of Norfolk v. Kirby, we realize that they were prescient and that they actually foresaw the rule that the Supreme Court would ultimately hand down in the Kirby case. It established that when the principal objective of a contract is to serve a vessel engaged in maritime commerce, the contract is maritime. But when the principal objective of a contract is to serve a well for oil and gas, a fixed platform, or other land-based interest, it is non-maritime and controlled by state law, whether through incorporation into federal law under the OCSLA, if the jurisdictional requisites are met, of course, or directly under state law if within a state jurisdiction. LDI's focus only on the first sentence of the choice of law clause in the master service contract that existed between the parties here, between Apache and STS, is unavailing for that reason. Because the application of the current controlling Supreme Court precedent determines that maritime law is not applicable to STS's contract. That determination and the conduct of STS's work on a Louisiana fixed well platform mandate under the second sentence of the master service contract's choice of law clause that Louisiana law must apply in this case. And, of course, that assumes that the party's choice of law within their contract necessarily controls. That's an assumption, again, that LDI makes, I think, in this particular case, given the fact that the master service contract provided for those alternatives, that is, maritime law, when it applied, effectively, when it applied of its own force, would apply, would be chosen. Or, if it did not apply, if it was determined that maritime law did not apply, then the state law would apply, and it would be the state where the work was done. In this case, no question about that, that's in Louisiana, they're in Louisiana state waters, essentially a virtually landlocked lake in the coastal area of Louisiana Lake Verde. Now, moreover, application of Louisiana law in this case, beyond merely the fact that it's specified, effectively, under the master service contract choice of law provision, but it also acknowledges the strongly expressed state interest in regulating contracts pertaining to oil and gas wells within the jurisdiction of the state. And in particular, the public policy of avoiding all aspects of indemnity agreements against the indemnity's own negligence, which is fundamentally the reason we're here and the reason that cases like Davis ever came into being. And I'd suggest to your honors, and we'll develop this further in the argument, that the Davis factors, that's part of the reason the Davis factors have led the lower courts and parties somewhat astray, is that they tend to be overly concerned with the tort issues that are presented in these cases that involve indemnity and the question of whether or not that indemnity is valid. As a result of whether the Louisiana state law applies or maritime law applies. The state interest, though, of Louisiana is strongly stated, it's expressly stated in the Louisiana Oil Field Anti-Indemnity Act. It is acknowledged and has been vindicated even under federal law where incorporated through the Outer Continental Shelf Lands Act. Those cases have repeatedly held that the Louisiana Oil Field Anti-Indemnity Statute does not conflict with federal law and even with maritime law. Several cases from this circuit have so held, Thurman being one among them, Thurman versus Delta Well Surveyors. The meat of STS's contract with Apache was a verbal work order, the terms of which are uncontroverted in this record. LDI made a great deal of noise in its argument and in its brief about the idea that somehow this was a subjective issue because the work order was verbal. Well, it's not subjective. It's about as objective as it gets because not only is the evidence, again, uncontroverted. All right, you're now open for questions. Yes, I understand, Your Honor. Thank you. Not only is the evidence uncontroverted, but the, again, uncontroverted objective facts of this case show that STS didn't have a vessel. They weren't asked to bring a vessel. They didn't operate a vessel. STS, my client, was only there to perform work on a well, to put chemicals, equipment, tubing into a hole in the subsurface of the state of Louisiana on a fixed platform. And only as a result of the fact that Apache, the owner of the well and the platform, did not have any form of lifting device on its platform, Apache, separately, without asking STS to do anything else, made a contract with an entirely separate third party, LDI, to provide the crane that Apache just didn't have on its platform. Can I ask you a question? Yes. If the question before us is whether to retain the Davis factors, a lot of the impetus to change them comes from scholarship. Is there, has that scholarship identified any case in the 30 years that we've been applying the Davis factors that came out wrongly using the Davis factor? My understanding is that, well, obviously, it's our position. In this case, has scholarship identified, has the scholarship that's criticizing the Davis factors identified a single case that they say would come out differently if we applied the revised Kirby test? Has the scholarship said there's a single case that came out wrong? I believe, Your Honor, and unfortunately, the name of the case is escaping me, but I think that it is, I think it's fair to say that the scholarship and the analysis that's been done regarding application of the Davis factors would indicate that cases involving, um, uh, casing services with respect. Let me mention one that you'll know by name. The district court relied primarily on our 2005 Hoda decision. Is it your opinion that if we accepted your revised test, that decision would come out differently? Yes, Your Honor. I think it would. Even though the scholarship points to that case as one that was rightly decided using the Davis factors. I think it was, I would agree that it was rightly decided using the Davis factors as they have evolved. What about the Thurman case? In that case, that was a wireline case where the work was done from a vessel and the panel concluded that it was non-maritime. That's correct, Your Honor. And what we see in the Thurman case is, as I mentioned earlier, that's certainly a case that presaged the rule that came out of Noffitt v. Kirby. In fact, Thurman actually states and refers to the idea that the focus of the contract is, or the principal objective of the contract is what the court has to look at, not specifically the involvement of the vessel. Let me ask you just a general question. As you know, I filed a concurrence in this case. Do you have any, I'd like for you to critique it. Is there anything that you'd like to change about it or is it all wrong or what? No, Your Honor. I thought it was very well reasoned. We sometimes talk about throwing a softball. That's more like a beach ball. Yeah, that was an easy one. Thank you, Your Honor. The only thing that I would say beyond that is I think we could go further. It's not necessary to go any further in this case, specifically in this case. Well, let me ask you a question then. Are you basically drawing, would you have this court draw a firm distinction between fixed platform offshore production and jackup rig or drilling vessel offshore production? Because the only difference I see between this case and HODA, and I wrote HODA and I'm willing to see it overruled if we can do a better line. But that was clearly oil and gas work, but it was on a jackup drilling rig and that's what governed the determination. So even if we change to another formula, there's still going to be a practical distinction, is there not, between the fixed platforms and the rigs, I mean jackups? Yes, Your Honor. There's no question that that is a viable line that can be drawn today and that would deliver substantial justice, I think, in this case. In this case, but what would it do for any other case? Because your contract with Apache looks to me like an onshore-offshore contract. I don't know if Apache drills onshore, but I mean except for a couple maritime clauses, it could pertain equally well to drilling onshore. That's correct, Your Honor, and that's in fact what we understood and what our client contracted under. And so there's a big problem that the insurers here want us to draw some firm line for purposes of evaluation and indemnity and so on, which I understand, but it really wouldn't help in that many cases, would it? I think it would help in a large number of cases because there certainly are many cases that do involve specifically the question and that will have those specific facts. They're either on a MODU, a mobile offshore drilling unit that is a special purpose vessel, or they're on a fixed platform somewhere. It could be on the OCS. It could be within state waters. Either way, same result. State law would apply on the fixed platform. You still have to ask some questions when it comes to a special purpose vessel. The problem with that rather nice, clear, clean line that certainly helps me in this case is that it's not consistent with Kirby. It's not consistent with this Court's jurisprudence prior to Davis, such as Thurmond, and I believe Domang as well, dealt with the idea that the focus should not be geographic, solely geographic. The focus should be on the principal objective of the contract. If the principal objective of the contract is to drill into the ground or to construct a structure on the ground, then it is appropriately not maritime, even if a vessel may be involved in some way, even if the work is actually done on a special purpose drilling vessel. And that would obviously change casing cases as well as the blowout preventer cases. It would be a very substantial change. But as I say, I'm not necessarily . . . I thought you were at the end of the sentence. I didn't want to cut you off. You've got a red light, and you've reserved your time for rebuttal. Yes, Your Honor. Thank you. And I've ceded time to our amicus. Let's hear Mr. Watson. And you've also wanted uninterrupted time for your initial part. Is that right? Yes, Your Honor. Thank you very much. May it please the Court. This case presents this Court with a long overdue and unique opportunity to restore some certainty and predictability to the issue of what constitutes a maritime contract. The problem in this area derives not only from the Davison son's opinion, but from the fact that there are two lines of authority in this circuit that are, quite frankly, utterly irreconcilable. On the one hand, there's a line of cases, including decisions authored by John Minor Wisdom and John R. Brown, two of the most preeminent maritime jurists to sit on this bench or any other bench, that conclude that oil and gas exploration and production are not maritime commerce and that contracts for the construction of offshore production facilities and pipelines and wireline services are not maritime contracts. On the other hand, there's a line of authority that states that drilling contracts and contracts for casing services are maritime contracts and that offshore drilling is maritime commerce. This Court sitting en banc does not need to accept either line of those cases. It's bound by none of its prior decisions and bound only by the decisions of the United States Supreme Court. And accordingly, I think the starting point in the analysis has to be the most recent pronouncement of the Supreme Court on what constitutes a maritime contract in Norfolk Southern Railway v. Kirby. In Kirby, the Court made it clear that you cannot look to the involvement of a ship or a vessel to determine whether a contract is a maritime contract governed by maritime law. Instead, one must look to whether the principal objective of the contract is maritime commerce. And the Court also gave a very strong indication as to what it thought was maritime commerce, quoting from Gilmore and Black, who stated, ideally the admiralty jurisdiction over contracts ought to include those and only those things principally connected with maritime transportation. The decisions of this Court in Laredo Offshore Constructors, Union Texas Petroleum, and Thurman are completely consistent with this view. As counsel just stated, it's almost as if they had been written in the aftermath of Kirby. Those cases all conclude that offshore oil and gas exploration and production is not maritime commerce and that contracts involved are not maritime contracts. And in Thurman, Judge Wisdom went on to state the fact that maritime law simply doesn't have answers for the questions that arise under the typical contract for services in the oil and gas industry. If you look at any treatise on drilling contracts, for example, you will see that the issues that arise under drilling contracts are not, there's not a word in the, you could look through every maritime treatise in the world and you would not find one word about those issues. In fact, the only issue that maritime law has an answer for under these contracts is the question of the enforceability of indemnity agreements. And, of course, that is not an issue unique to maritime law. The decisions on that are based on principles that are common to all common law and civil law jurisdictions. The drilling contract cases and casing service contract cases, on the other hand, are completely inconsistent with Kirby. The principal factor they look to, those cases look to, in determining that a contract is a maritime contract is the fact that a vessel is involved. And they're based on the early cases that established that principle that then just continued in the jurisprudence. The court cited two stevedoring contracts, which, of course, a stevedoring contract is very much related to maritime transportation. These cases also overlook the justification for a body of uniform maritime law. The purpose of a body of uniform maritime law is to protect maritime commerce, and by that the court clearly means, in Kirby, international and interstate commerce. Ships move. Ships go from one jurisdiction to another, and it helps maritime commerce to have a common body of law apply. Oil wells don't move. A drilling rig that is performing drilling services, for example, will never move while it's performing the principal objective of the contract. This case in point provides a good example of the absurdity of applying uniform federal maritime law to this accident. This well was located in Lake Verret in the interior of Louisiana, and it's inconceivable how anything to do with this contract would ever impact interstate or international commerce. Finally, the extension of maritime law beyond the needs of traditional maritime commerce raises serious issues of federalism in that this has always been an area governed by state law. Any questions? I want to talk to you a little bit about the Gilmore and Black site. I really believe you're misreading that provision. I'm looking at it now. It starts at page 30. It first talks about unwarranted extension of jurisdiction primarily in tort, and then it says, on the other hand, some transactions closely connected with maritime transportation have been excluded. On the ground, they were merely preparatories of such transportation. Ideally, the jurisdiction ought to include those and those things principally connected with maritime transportation. So merely the lower courts have been over-inclusive as to torts and under-inclusive as to contracts. So what they're saying is that maritime contracts should be extended to include preliminary contracts, and that's what Justice O'Connor used to add to the shipment from Australia to sub-Savannah to get the land leg of that transportation from Savannah to Huntsville. I mean, that's an extension that Gilmore and Black supports, and that's what Justice O'Connor was using. Your Honor, with all due respect, the contracts that Gilmore and Black were referring to were contracts that, remember, the second edition, which I think is 1973, they were referring to contracts that logically should be included. The one that comes to mind immediately is agency contracts, and prior to the decision, I'm struggling, Exxon was involved in the case where the Supreme Court extended admiralty jurisdiction to general agency contracts for shipping. Those contracts were excluded. I think you could make an argument about ship construction contracts, but I think that was the focus of that comment. Well, I agree, but, I mean, you rely on that one sentence where you say jurisdiction ought to include principally those things principally connected with maritime transportation, and that's not a fair reading of that section. I differ, Your Honor, but I think that's also, that's clearly the import of the decisions of this court in Laredo Offshore Constructors and Union. I mean, I'm sure you're aware of the fact that we've got multiple cases saying that offshore drilling and offshore production activities are maritime commerce. It's certainly commercial, and it's, I mean, if you have a drilling rig, somebody needs a well drilled in the middle of the ocean, the only practical way to do it is send a rig out there and drill it, and it drills that well and moves on to another rig. Why is that not commercial maritime activity? Well, it is commercial, and it's maritime in the sense that it is over the water. It's not maritime commerce in the sense that the transportation aspect of that contract is relatively incidental. A rig, if you hire a rig to go drill a well offshore, the transportation might be three or four days going out and three or four days coming in. So basically all of the decisions that have been rendered in the Deepwater Horizon case would have to be reconsidered under your test. Well, I don't think the— It was a vessel, and as I understand it, the whole, all the questions of liability and indemnity and whatever were framed around maritime law. Well, Your Honor, to begin with, a ruling that maritime commerce only includes those things related to maritime transportation would not change the fact that these special purpose vessels are vessels. They would remain vessels. They're defined by statute as vessels. It would not alter the fact that the workers who have the requisite connection to those vessels are seamen. That would remain the same. Contracts to tow those vessels, contracts to salvage those vessels, all that would remain the same and governed by maritime law. You know, Justice O'Connor relied heavily on the Cossack Supreme Court case, and in that case the contract was between the shipowner and the crew member where the shipowner agreed to pay for any malpractice that the public hospital would do, and if he had malpractice or suffered from that, they would pay for it, and the court said that was a maritime contract. What did that have to do with transportation? Well, the relationship between ships and seamen is a very traditional maritime activity. Ships can't sail without seamen, and crew contracts and contracts relating to seamen have always been considered maritime and would continue to be considered maritime. Basically, the question is, if you're talking about what is a maritime contract, is, again, what is the principal objective of the contract? In the case of a contract with a seaman or a contract to provide supplies to a vessel, a contract to repair a vessel, all of those things are intimately related with maritime transportation and enabling vessels to move. Vessels can't move without seamen. They can't move without bunkers. They can't move without food on board for the crew. All right. Mr. Watson, you have red light, sir. Thank you. Thank you. Mr. Escovitch, is that correct? Yes, Your Honor. And I've waived my time for peace, so. Yes, sir. He's wide open. Your Honor, if it pleases the Court, I'm Alan Escovitch. It's my privilege to represent Larry Dwarron, Inc., and Mr. Jackson, and with me at the table today is Bill Emery, my co-counsel. I think that when we get to revisiting whether Davis and Sons should be revisited, which is why we're here, I assume, is because of the interplay between state law, between the interplay with maritime law, and, of course, the Kirby decision. The Kirby decision is, at this point, the leading case from the Supreme Court, and what's very clear from the Supreme Court is an expansive view of the application of maritime law. It applies in almost any conceivable situation when the contract in question has, as I quote from it, reference to maritime services or maritime transactions. That's it. It's a very narrow touchstone. Uniformity, of course, is there, too, but the point about being a maritime contract is that it has reference to maritime activity, and that's what we have here is a contract that references maritime activity, contemplates maritime activity, and encompasses rules and regulations and requirements when maritime activity is involved. How is it maritime activity to go out on a fixed platform and do, I guess, remove some obstruction so the whale will produce? Why is that marine activity? Your Honor, if you look at particular individual tasks, you can eliminate any contract from being maritime. What happened here was you have the overarching master service contract, the MSC, which says if you're working in, on, or above the waters, navigable waters, then you have to do certain things. You have to have insurance. Your choice of law applies, everything of that nature. Then you have a small carve-out from that, or a small addition, I should say, which is the work order. In this instance, we would like you to go to this particular rig and do this particular work on the rig if you can do it, but bearing in mind at all times, if you use a vessel, all these maritime components come into play. And so what happens is they go out, they take a boat, they go out to the platform, and they try to do the work. They can't do the work. So they were trying to do work without triggering their maritime activity, without triggering maritime commerce. They couldn't do it, and that required the barge to come out and for them to use the crane on the barge for the performance of their contract. That was contemplated. It was anticipated. It was contracted for. Insurance was provided. The whole maritime panoply of things going on was happening. They tried to not trigger the maritime component. They couldn't. So the bigger contract says— Why is the contract with LDI to provide a vessel part of the contract with STS? STS's contract says that whenever you use a vessel, not own it, lease it, charter it, hire it, pay for it, when you use a vessel and the performance of this contract, which is what they did, then maritime law applies. You have to have the insurance, longshore insurance, the Extension Act insurance. Everything has to apply. So the contract between STS and Apache, which, touching on an earlier point, is a Delaware corporation headquartered in Houston, so interstate commerce is clearly involved, that when you deal with that situation, STS's contract is maritime. What paragraph of the contract is that? I think you're misquoting it. I'm sorry. What paragraph? You're saying it whenever a vessel is used. The way I interpreted it was whenever SDS has to hire a vessel. I believe, Your Honor, the contract says whenever they use a vessel. Well, would you please tell me the paragraph? I'm sorry. I believe it's in the indemnity, and it's also in the insurance clause in the back. Okay. Well, that's enough. I don't want to interrupt you completely. But it's within the terms of the contract there. Would you agree that the contract language would not be controlling if, in fact, under whatever our ultimate application of the law is, it is, in fact, not a maritime activity? Wouldn't the Louisiana Oilfield Indemnity Act trump what you try to do in a contract to try to pull in non-maritime activities under maritime rules? In this particular instance, if this contract were being performed strictly on land, strictly inland on the land, not the artificial things we're talking about, but actually on land and they were doing work, there would be no vessel. There would be no involvement. There would be no maritime component to it. My question, and maybe you answered it, and I'm just not picking up on where that connects to my question, but it does seem to me that what the Louisiana Oilfield Indemnity Act says is that the contract doesn't control if it's not a maritime activity. The contract does not say that it doesn't control if it's not a maritime activity? It ain't by contract trump what the Louisiana Oilfield Indemnity Act otherwise requires. Well, the Louisiana Oilfield Indemnity Act can be trumped because it doesn't apply in the maritime context. When you have, and what we've done is the contract provides for the application of maritime law. So that's irrespective of whether maritime law of its own force applies. That's an OCSLA-only concept, maritime law of its own force applying. This is a contract freely negotiated that says we will apply maritime law whenever you're working in, on, or above the water. Under maritime choice of law provisions, that's perfectly enforceable because the district court sat in admiralty under 1333, 28 U.S.C. 1333, not under federal question, not under diversity. So it's a jurisdictional component, and the courts are absolutely clear from the Supreme Court to this court that when a court sits in admiralty, it must apply admiralty choice of law. Let's talk about that. 28 U.S.C. Section 1367 gives federal courts in federal question cases supplemental jurisdiction to handle state law claims. What happened here, as I understand it, is LDI filed a third-party complaint in the limitation proceeding, so that triggered 1367. If Louisiana law controls the contract, then the admiralty court is fully capable of enforcing it. You raise an interesting issue, Judge. The third-party demand by LDI against STS and Zurich had its own separate jurisdictional statement, which was 1333. So it was founded on admiralty because the underlying claim is an admiralty claim. I don't think anybody disputes that there was a maritime tort involved. Well, you've got a limitation proceeding, and then you've got a third-party complaint coming out of that. You've got a limitation action. You've got a third-party demand. Remember, LDI was the original plaintiff. Then Mr. Savoy jumps in to file his claim in that action, and as part of his claim, LDI, which is the original plaintiff, files a third-party demand against STS. That's what I know of. But that separate complaint, that separate third-party complaint, establishes its own jurisdiction under 1333 based upon the claim by Mr. Savoy, which was a maritime tort. Why doesn't it come under 1367 supplemental jurisdiction? Because nobody alleged state law applied. Well, I mean, whatever law governs, governs. That's in some ways true, but when the parties assert jurisdiction in admiralty and it is in fact based in admiralty and in fact a maritime tort which gives a broad basis for jurisdiction under 1333, you don't need to get into the state law. I'm not saying the court can't address state law issues, but that's not what we have to deal with here. We are dealing strictly with the merit of the court sitting in admiralty, which thereby . . . Are you saying that the choice of law provision is enforceable here? Absolutely. I mean, what do you do with our cases that say that when the contract is not a maritime contract, you must apply Louisiana law, and when you apply Louisiana law, you can't enforce the Louisiana Oilfield Indemnity Act. Those cases uniformly, if I'm mistaken, please correct me, uniformly are OCSLA cases which . . . Oh, no, they're not either. Go ahead. I mean, all the ones that we have seen have been OCSLA-related cases where the court has adopted Louisiana law, and some might have used some loose language. I'll give that, but the reality is under OCSLA, the Congress said the state law shall be adopted and shall become the law of the United States. That does not apply on non-OCSLA territory, on the intercontinental shelf, inland waterways, rivers, lakes, any place else that's an avenue for water. OCSLA and its incorporation or adoption of state law don't apply. It remains a maritime issue in maritime jurisdiction. So under the . . . We have a choice of law provision that we do believe absolutely is enforceable, that under admiralty jurisdiction, you enforce it based upon maritime or admiralty choice of law provisions. The choice of law applies, the indemnity applies. It's a fairly straightforward and simple argument there. Assuming if we were to overrule Davis and create a new test, what happens in this case vis-à-vis the circumstances of your client? Depends on which test you come up with. Okay, all right. I've got more than one question I can ask. Assuming that the Davis test, with its history, has been used, but as is advocated here, a new test that's more specific, et cetera, I thought I read in the brief some argument from your side that, well, first of all, there's nothing wrong with Davis, but if you change it, we're left out in the lurch because we relied to our detriment or whatever, based on what the state of the law was, et cetera, et cetera. I'm really sort of asking the question of, if we make a change, what does that do here? In the earlier case, we had some argument. It's arguable whether the circumstances would change at all, no matter what we do. In this case, my sense was, secondarily, that if we make a change, potentially that's not what the parties bargained for, relied on, et cetera. I'm just asking. What would the consequence be? Well, again, it depends a little bit. We were predicating it largely on Judge Davis' proposed test, which would be exclusive performance upon a vessel, would make it maritime. Otherwise, presumably it would not. When we looked at the Amici's brief, it was even more narrow, if it only relates to maritime transportation, which I don't think would be a much more restrictive application of maritime law than even the Supreme Court in the Maritime Admiralty Extension Act would apply. So if you took those two, I think that we could conceivably have a totally different outcome. I know Judge Davis' proposal would flip the result, because the work here was not performed exclusively upon a vessel. There was work performed on the platform, and there was work performed by and with the vessel. That's what caused the accident. If there were no vessel here, there would be no accident. There would be no claim. We wouldn't be in court. So if it goes that way, there would be an absolute change. The contract would, in a sense, be flipped so that everything is changed. Now we're now saying that instead of being a federal question, instead of being a maritime question, instead of being a maritime contract, that's enforceable under the indemnity provision. Now it would not be enforceable. That's an absolute 180-degree turn. If you were to take what I think is a more appropriate reading of Kirby and Cossack, which is an expansive view, that if you're basically utilizing maritime commerce, if you're utilizing it in the performance of your contract, it's maritime. And the only way to get away from that when you're in, on, or above the navigable waters is to really isolate yourself onto that narrow, artificial structure sticking out of the ground. Once you go over the water, once you're in the water, once you're using the barge, once you're using the crane on the barge, it remains maritime. And so I think the courts have been very hesitant to draw these black-letter rules on where maritime law stops, where maritime law starts. It's been a difficult boundary decision. But when you get into cases such as the Jerome Gruber case, which was a maritime tort in the Chicago River, the Supreme Court took it with the Admiralty Extension Act and said, you know, helping build bridges, helping build docks, helping build anything that's on the land, if you're doing it from the water, is still maritime. Maritime jurisdiction attaches. It was a jurisdictional issue. And so I think when you take all of those cases together, the Supreme Court has gone very broad. Maritime doesn't require salt that makes you gag. Okay? It just takes a little bit of salt and that's it. What do you say to Kirby's test if the principal object of the contract is a maritime transaction? Well, you know, that's an interesting point because Kirby says that the principal question is whether the contract references maritime services and maritime transactions. And they do say, as you've just quoted, but I don't think that's the crux of the whole case. The crux of it is if it's involving maritime activity. See, I thought that was the whole point because, you know, the major part of the transport was from Venezuela to, I mean, was it Venezuela? Australia. Australia to Savannah, Georgia. And that was the principal object of the contract. And because of that, they could add on that land leg, which was a short distance. Well, it was shortish, but, yeah, no, you're right. But that was that particular factual scenario in that case. But the court was very clear in saying that the main concern is that if it has a reference to maritime. And I think that's the starting point. That particular factual scenario, it had reference. We get into a situation where if somebody's on a vessel and they go one mile and then they go ten miles by land, is it maritime? If it goes ten minutes on the water and an hour by land, is it maritime? We start getting into these. We're back to a Davis sort of analysis of trying to weigh what's the dominant theme? What's the longest part? What's the most predominant part? Was this really? And from the mariner's standpoint, which is my perspective, from the mariner's standpoint, if a vessel was called in by Apache or STS or anybody else and said, come on over, and they were based in Florida or they were based in Alabama, New York, it doesn't matter, they come in. They should be expecting that when they're doing their work, they've got all the protections available under a contract that will be there. Let me ask you a question because you said this contract has a reference to maritime because it has an insurance provision, and I found it. The insurance says if contractor uses any vessels in connection with its work, well, I mean, they could have rowed a canoe out to the fixed platform, and according to you, that would make it a maritime contract. Is that right? Well, Your Honor, getting out there and doing the work are two different things. It's sort of like the typical. Who says? I mean, are you saying that? Well, no, it's not me, Your Honor. You're construing uses very broadly because when I first read this, if contractor uses any vessels, I had assumed that that meant that if STS contracts directly with vessels for use in the work, then they would have to carry all this maritime insurance. So what does use mean? And I'm not speaking simply about this contract. I'm speaking about the variety of circumstances that you're talking about. I appreciate that, Your Honor. That was addressed below in the panel, but the question of use and the performance of the contract as opposed to commuting to your job, similar to an IRS situation. Well, now you're mixing the tort and the contract. I understand, Your Honor. I understand. I will tell you that whether you take the totally expansive view that including transportation out there, when you mentioned the Deepwater Horizon, I had an image of this structure out in the water and all the boats out there blowing water on it to try and put the fire out and to try and rescue the guys who had fallen off of them, to try and put out the catastrophe that was unfolding before everybody. And there it was, and I'm looking going, how in the world could this ever actually be not maritime under any circumstance? They're sitting in the middle of the ocean on this little bitty dot that was just plopped down there. Deepwater Horizon, of course, was not permanently affixed, but you do get permanently affixed structures inland and you do get permanently affixed structures out there. So basically you're only arguing for a result in this case. You are not arguing for something that clarifies the law going forward because if we go forward under the Kirby deal, then the maritime, the offshore production industry, is going to be thrown into disarray for the next 30 years while we figure out the new test. Well, actually the test that we proposed, which is just a proposal, of course, is that if you can do all of your work on that platform, on that artificial structure that's sticking out of the ground. Isn't there an expression, no man is an island? There is indeed, and the whole fiction of the islands has become problematic too because that's an Oxley import. Oxley even allows jackup barges, for example, a temporary fixture upon the outer continental shelf to be considered as part of the land and therefore controlled by state law. So it's really slippery slope dragging Oxley in, which explicitly incorporates state law as federal law. Let me bring you back to the choice of law clause. I've got two cases for you, Verdine versus Enscoe, and I've got Roberts versus Entergy. Both those cases were accidents in state waters, and the court found it was not a maritime contract and refused to apply the Louisiana Oilfield Indemnity Act because it would be against the public policy of Louisiana. These are not, and I think there are more cases than that, but I know there are two cases that are in state waters. With all due respect, Your Honor, I would have to go look those up because I'm not familiar with them today. When you start to articulate the rule, if you can do all your work on the structure, then it would be non-maritime. That's the limiting principle? That would be the limiting principle. But the district court largely felt it was bound by HODA. HODA's the flip. They couldn't do any work because the wellhead was below water. It was below water. Right. So to me, HODA's easy. That's maritime under your rule. But the district court felt it compelled an outcome here where the majority of the work was on the structure. So I don't, even if we don't adopt Davis, I don't see that HODA's as compelling to the outcome as the district court felt it was. Well, I think HODA under a Davis analysis works. If you take a new standard, a new test, it really requires you to be isolated upon the island so that you really are on the land, then that's fine. But because when you have the neighboring floating vessel coming on land because of Admiralty Extension and everything else, it is, in fact, a maritime. You're sitting in the water. Even an incidental act not contemplated, you would say? I would say even incidental stuff. One other question. I think, I mean, you've been very clear, so I'm only interrupting because I think I understand your position. But there was a partial unanswered point to if you don't prevail. You had cited Chevron oil, 1971 decision, for at least as to your clients. It would have to be prospective only. What's our court's best application of prospectivity? The best application? In other words, that's a strong statement, and I read that case to have been adjusted by later Supreme Court law. So I'm really just wondering, do you have a Fifth Circuit case that would speak to if your client doesn't prevail here, it still couldn't be applied, the new rule couldn't be applied to him? With all due respect, I've looked, and I don't know that I found one. Okay. Thank you. Do we have, are we just concerned with the oil and gas industry? Is it possible there are other industries that could be involved? And if we're going to adopt a test, should it be specific to oil and gas, or should it be more generic to address other possible industries that could be involved? I'm glad you asked that, Your Honor, because this is a very oil and gas specific issue because of the Louisiana Oilfield Indemnity Act and the Texas Oilfield Indemnity Act, and we're carving out an industry from a nationwide application of law that otherwise conceivably would apply. We have offshore windmills going up all around the country now. We have offshore surface mining as opposed to oil and gas, where they're extracting products from the bottom of the sea. All these things come into play. I can foresee many other things as technology changes where you'll be doing more stuff in the sea, which brings me back to Kirby because Kirby dealt with and very explicitly specified that they were dealing with container cargo, and the containerization had been a massive change on transportation of goods by sea and otherwise. And so the Court recognizes technology changes. We need to adapt. The courts need to adapt to a situation that's new. We have tried for years to try and carve out the oil and gas industry from maritime law involvement, and it's something that I can respect. It's been there. The case law is very well established. But when it first happened, it was new and nontraditional. Now boats go out every day to service the offshore industry. It is part of being in the ocean now. And so if we can take container cargo that now transports across the land by train as being maritime, then everything else that comes in the future ought to also be similarly. It's almost like carving out an asbestos claim from everything else under the sun. This is a very narrow carve-out, and it's only for oil and gas, and it's only because, so far, only because of the Louisiana Oil Field Indemnity Act and the Texas one. Louisiana Oil Field Indemnity Act only applies to work on an oil or gas well, doesn't it? That's what I'm saying. That's why if we get into offshore windmills, for example, which are popping up around the country, law is not going to apply by its own terms. And so we start getting into an interesting carve-out where other things may be maritime. So as you go through and develop this rule, things that are going to be maritime or may be maritime, such as the windmills, may be controlled by a different set of laws, even though they're in the same waters, maybe next to, maybe even upon those same structures that are in the water today. Wouldn't that be in the legislature, not for the judiciary? Agreed. Agreed in many respects, which is why I get back to the Oxlo, because Oxlo was a legislative mandate as well by the national government, by the Congress, and it very clearly drew its lines that state law only applied to these structures, these artificial islands on the outer continental shelf, and it's inappropriate to extend that command from Congress into inland waters or neighboring waters, near inshore and inland waters. So we've got to be careful from the court's perspective, and I know everybody respects that, everybody understands it, is to not take on what Congress should be doing or that, well, the Congress should be doing and expanding congressional mandates beyond the outer continental shelf. Well, Counselor, it seems to me that the suggestion that Davis has made and the Davis task are sort of two conceptual ways to deal with the problems we're dealing with and whether the legislature has a role or not. You can always take such a role if you're inclined, but one looks at the overall contract. What's going on out there at this rig? The other, one of the reasons Davis has been criticized, maybe unfairly from your viewpoint, is that it's more tort-related, looking at what the individuals were doing and their specific activity, whether on the canoe that Judge Jones was talking about with a crane on it trying to do some work that's mixing her hypotheticals perhaps. Do you agree at least with the criticisms that the Davis test does focus more, and I seem to be asking you to give away your case, but does focus somewhat on tort issues and not really contract issues? And there is a choice to be made here. Should we look at the governing contract and the purpose of it, as Kirby would seem to at least direct us to some extent, as opposed to the individual specific activity that worker, injured worker was doing? The problem is we have a contractual indemnity that is triggered upon the occurrence of a tort. So it's very hard to disengage the two analyses, because absent a tort there's no indemnification, right? Absent the indemnification, then the tort really doesn't matter. It's handled otherwise. So we can't totally disengage the tort-based analysis. What's happened is we have twisted the maritime law to fit in with oil and gas and with the Louisiana Oilfield Indemnity Act and Texas Oilfield Indemnity Act. It's been a bit of a stretch, and so we're in this situation now where the only time- Do you really think Judge Rubin had that narrow perspective in articulating Davis? I never thought Judge Rubin had a narrow perspective on anything. Exactly. And also, I mean, this court has an opinion called Aleman that appears to reconcile Kirby and the Davis test, right? What do you think about that? I'm not sure if it's a full reconciliation at this point, because if it were a reconciliation it would in effect be contrary to Davis, and therefore it would have been contrary to the court's rules. So your deal is Kirby and Kirby only? Well, Kirby- And abandon Davis. Is that what your rule is? Well, if I'm going to come up- I don't mind Davis. I mean, you want to win. I want to win, right. I can't figure out from all these things that you're throwing out here exactly where you stand on these- Well, taking the premise from the concurring opinion, I personally think that Davis was applied fine. Davis is not a problem. It's not that difficult to apply. It may be a pain in the neck in some ways, and lawyers may sometimes twist it around. I understand that. That's sort of the nature of litigation. So I don't really have an inherent problem with Davis. But if we're going to go to an alternative test that's going to be universally applicable, that's why we suggest that if it's in, on, or above the navigable waters, it would be maritime unless you can absolutely narrow it down to being work simply performed purely and exclusively on the island without any extension from the sea. Your test is if there's any involvement by the employer of the man who is injured or any involvement of a vessel, whether it's provided by the employer or provided by somebody else, any involvement in a vessel makes it a maritime contract. That would be a very clean black-letter law, yes. Pardon? That would be a very clean, black-letter, straight-line boundary. I would actually go with that. It would clean up many issues. I understand there may be some policy issues you all need to discuss on that. But, yes, I would actually draw a very straight line. Okay. Unless the Court has any other questions, I think that we can simply say that- Could I ask a question? The perspective argument that you make, how much of a tweak has to take place for the perspective to kick in? Maybe you've answered that already, but I'm not quite sure. I'm not 100 percent sure what the tweak would be, but in this case, if it results in a reversal, that would trigger it. So it's a results-oriented perspective. I think so because the Supreme Court was coming out with a decision in the case of Chevron, for example, that if it didn't undo prejudice to the participants, yes. So, yes. Thank you. All right. Thank you, sir. All right. Back to you, Mr. Bridger. Mr. Rebellin. Thank you, Your Honors. I just want to start off as quickly as I can to make it abundantly clear. All of STS's work, the entirety of the flowback operation, they were contracted by Apache to do, took place on the fixed platform. They did not work on the boats or barges. There's no question about that. The contact with the barge was the tort, not the contract. Now, beyond that, Judge Davis, I believe you asked about the Roberts versus Entergy case, and I believe that we had talked about that in our panel briefing, and that case could be conceivably somewhat helpful to the Court in terms of developing the reasoning that's more in line with what the Supreme Court is requesting of us, and what this Court has already adopted in the Outer Continental Shelf Lands Act venue under the Grand Isle Shipyard case, and that is the issue is the focus of the contract. What is, or the principal objective of the particular contract that's under consideration? Not third-party contracts that may come in and have some involvement, but they're still separate contracts, and that's the issue here. We're talking about contracts. In the Robertson case, if I recall correctly, that was a case in which the vessels that were involved and that were contracted for were solely being used as work platforms, and so their involvement with the work that was ongoing, I believe in the Intracoastal, was not sufficient to trigger maritime jurisdiction or the application of maritime law in that case. I hope I'm getting it right, but I think that that was the case that was being referred to. Beyond those issues, and going back to the fundamental question that brings an en banc court together, and that is it's clear, and it's been said again and again and again, that the Davis factors are problematic as a test to separate out what's a maritime contract and what isn't. Mr. Berger, you didn't argue to Judge Dougherty that the Davis factors conflicted with Kirby, did you? Did you raise that below? We did not. That was not specifically argued below. What was argued below was that a proper application of the Davis factors, which would be consistent with Kirby and Thurmond and Domang and all of those other cases that actually favor the principal objective of the contract analysis, that an application of Davis factors that was consistent with that would achieve the correct result. And I think that's true today. The position being non-maritime, right? Pardon me? The correct result would have been that the position would have been non-maritime. Correct, that the STS contract would have been non-maritime because, again, its principal focus, its principal objective, was nothing more than to perform some work to clean out a well on a fixed platform. Absolutely the same thing that they would do on land as they happen to do on an island. It could be a man-made island or an artificial island. Could they do that work without the piece of equipment that the crane was lifting onto the work area? Well, oddly enough, Your Honor, and again, this is somewhat of a problem from the perspective of, I guess, everybody getting lost in the trees instead of seeing the whole forest. The work was never successful. The vessel didn't make it successful. It didn't help them complete the work. It failed them too. They had to leave and go with a completely different approach at the end of the day to call out a coil tubing unit, which is something completely separate, not involved in this case, don't know if they ever did it or not. So the idea that somehow the vessel was necessary for STS to carry out its contract, there's nothing in the record that supports that because STS was never successful in performing the complete flowback operation that they were trying to do on this platform. But again, and I think it definitely bears emphasis, the fact that all of STS's work, Mr. Savoy and his helper, Mr. De La Houssay, all of their work took place on that platform. All of the contract work took place on that platform. All right. Thank you, sir. You have a red light. Please return. All right. Thank you very much. This concludes the argument in this case. Thanks to all candidates.